GARDNER, Respondent, vs. PAINE LUMBER COMPANY, Appellant.

*November 19—December 13, 1904.*

*Master and servant: Personal injuries: Contributory negligence: Evidence.*

In an action for personal injuries received by a servant in a planing mill, under the evidence, stated in the opinion, plaintiff is *held* to be guilty of contributory negligence.

APPEAL from a judgment of the circuit court for Fond du Lac county: MICHAEL KIRWAN, Circuit Judge. *Reversed*

This is an action to recover for personal injuries received by the plaintiff, November 23, 1901, while operating a machine called a "sticker," in the planing mill of the defendant at Oshkosh, resulting in the amputation of his right hand. The plaintiff claimed negligence on the part of the defendant (1) in failure to instruct, (2) in furnishing insufficient light, (3) in defective adjustment of the machine, and (4) in absence of spouts to carry the shavings from the knives. It appeared by the evidence that the plaintiff was twenty-six years of age at the time of the accident; that his home as a boy was at Winneconne, in this state; that he went to school from the time he was seven until he was fourteen years of age, when he began to work at the barber's trade with his father, and continued at that occupation in various cities of the state, including Marshfield and Marinette, until the fall of 1899, when he cut wood all winter; that he continued at the barbering trade during the following summer, cut wood again during the winter of 1900–01, went to Milwaukee and resumed the barbering trade during the following summer, and in November, 1901, went to Oshkosh, and obtained employment as a common laborer at the defendant's planing mill on the 8th of November; that he at first piled lumber, tied pickets, and did other miscellaneous labor of this kind about the mill, and that about a week before the accident he operated a molding sticker like the one in question, except that it was furnished with shaving spouts, during one afternoon, turning out what is called "electric light molding;" that he had no other experience operating such machines; that on the day in question he was set at work putting strips, one inch square, through the molding sticker in question, and turning out moldings called "quarter round;" that after he had been at work about twenty minutes one of the strips stopped in its progress through the machine, and that he pushed or pulled a lever which he testified that he supposed stopped the machinery, and went around on the side of the

machine and attempted to push the strip away from the guide by which he supposed it had been stopped, and his hand was caught and mutilated by knives revolving on what is called the "under head" of the machine.

The jury returned the following special verdict:

"(1) Excepting that plaintiff had operated a molding machine during half a day in the previous week, was he without any experience in doing that work up to the day of his injury? A. Yes. (2) Before the injury occurred, did defendant receive information from plaintiff to the effect that he did not know how to operate the machine? A. Yes, through Rathbun. (3) Did defendant fail to properly instruct plaintiff how to stop the motion of the heads which contained the knives in the machine? A. Yes. (4) Was the stopping of the quarter-round in the machine caused by defective adjustment of its parts? A. Yes. (5) Were all the incandescent lights extinguished in the mill when plaintiff was injured? A. No. (6) Was the light which was supplied for operating the machine at the time of plaintiff's injury insufficient to have enabled him to discover, by the exercise of ordinary care on his part, that there was in the machine an underhead which contained knives? A. Yes. (7) At the time of the injury, was the machine without any shaving spouts? A. By the court, by consent of counsel: Yes. (8) (Withdrawn by the court, and not submitted). (9) If the third, fourth, sixth, and seventh questions, or any one or more of them, be answered 'yes,' then, did the defendant fail to exercise ordinary care in relation to any one or more of the matters specified in those four questions and the answers thereto? A. Yes, 3, 4, 6, 7. (10) If your answer to the ninth question be 'yes,' then, in what matters referred to in the ninth question did defendant fail to exercise ordinary care? (See 3d, 4th, 6th, and 7th questions, and answers thereto.) A. In those matters or particulars which are specified in the third, did fail to properly instruct; fourth, by defective adjustment; sixth, light was insufficient; seventh, machine was without shaving spouts; questions and answers thereto. (11) If your answer to the tenth question finds that defendant did fail to exercise ordinary care in relation to any of the matters specified in that question, then, was such failure the proximate cause of

plaintiff's injury? A. Yes. (12) Before plaintiff was in-
jured, did he know how to stop the motion of the knives in
the machine? A. No. (12½) Did the plaintiff know, or
would the exercise of ordinary care on his part, with such
experience as he possessed, have enabled him to know, that
the so-called underhead with its knives was a part of the ma-
chine? Answer. (a) Plaintiff did not know. (b) The ex-
ercise of ordinary care would not have enabled him to know.
(13) Was plaintiff guilty of any want of ordinary care which
contributed to produce his injury? A. No. (14) If the
court shall be of the opinion that plaintiff is entitled to judg-
ment in his favor, at what sum do you. assess his damages?
A. 7,000.00 dollars."

Judgment was entered on this verdict for the plaintiff, and
the defendant appeals.

For the appellant there was a brief by *Thompsons, Pinker-
ton & Reed,* attorneys, and *Charles Barber,* of counsel, and
oral argument by *Mr. Barber* and *Mr. A. E. Thompson.*

For the respondent there was a brief by *Eaton & Eaton,*
attorneys, and *Maurice McKenna,* of counsel, and oral argu-
ment by *M. H. Eaton* and *L. K. Eaton.*

WINSLOW, J. The chief contention made by the appellant
is that the undisputed testimony shows that the plaintiff was
guilty of contributory negligence as a matter of law, and this
is the only contention which we find it necessary to discuss.
The discussion of this question necessarily involves a review
of the facts upon the most favorable theory to the plaintiff
which they will reasonably sustain.

The plaintiff was not a boy. He was a man who had
reached the age of twenty-six years. He had attended school
from his seventh to his fourteenth year, and then gone to
work as a barber; he had pursued this trade in various cities
in this state, a number of which were lumbering places, most
of the time till the winter of 1899 and 1900, when he cut
cord wood all winter, engaged in barbering again during the
following summer, and in the following winter again worked

at cutting cord wood. He was ordinarily intelligent and bright for a man in his walk of life; no claim is made that either his reasoning or perceptive faculties were in any respect impaired or dull. He went to work as a laborer in and about the planing mill of the defendant on the morning of the 9th of November. This mill was a large mill containing many planers, slashers, stickers, and other machines of like nature, operated by steam power communicated to the machines by line shafting and belts. The particular department in and about which the plaintiff worked was a long room, its length from east to west being three or four times its width from north to south. The shafting ran from north to south, and the machines in this room, which included six or more slashers, as many ripsaws, nine stickers, a planer, a matcher, and a picket machine, all fronted to the north, the rough lumber coming in at the south side of the room, passing through the machines, the finished product being taken out on the north side of the room. The machines generally were about four feet apart. The room was lighted, when necessary, by three electric arc lights, and by a large number of incandescent bulb lamps suspended by cords, so that there were two or three of such lights within a few feet of each machine. There was no electric bulb immediately over the machine in question, but there was one five feet from the north end thereof, and another four feet or so from the west side. The electric cords were long enough so that the lamps could be let down and moved about through a considerable space for the purpose of inspecting the machine. It is undisputed that these two lights, at least, were lighted at the time of the accident. The sticker machines were all of substantially the same general construction and principle. They are designed for the purpose of receiving strips of rough lumber at one end and turning it out at the other as a complete molding finished on all sides by a single operation. The one in question consists of an iron table or platform (over which the material

passes) about eight feet in length, three and one half feet in height, and the same in width, open on the sides. At the south end is the countershaft, power pulley, and pulleys to operate the feed and knives. The operator stands at the south end, and feeds the unfinished strips into the machine through guides. It passes first through the feed rolls, immediately after which it is operated on by the first set of knives, fastened to what is called the "top head." There are four of these "heads," called, respectively, the "top head," the two "side heads," and the "lower head." These heads are blocks of iron or steel, about eight inches long and four inches square, on two corners of which are set knives. They are attached to a short shaft, on the other end of which is a pulley, on which is the belt running to the power pulley. The knives and heads revolve at the rate of 2,000 revolutions per minute. The top head is necessarily above the table with its shaft and pulley. After passing the top head the material passes along the guide, and is operated upon first by one side head and then by the other. These side heads are of the same construction as the top head, but they necessarily are in a vertical position, projecting above the table, the pulley being beneath. The material then passes to the under head, which with its pulley is under the table, the knives being allowed to project slightly above the table through an aperture therein, which may be made to vary in width from two and one half to six inches. The finished material then passes out at the rear of the machine. The power is applied to and removed from the feed rolls and heads by means of levers at the right of the operator at the south end of the machine, one lever operating the feed rolls and another the heads. All of the sticker machines except the one in question had shaving spouts and tubes in connection with each head, whose function is to carry away the shavings made by the head. The machine in question, being new, had no such spouts, but the lack of such spouts is immaterial, because it did not contribute in any way to the acci-

dent. About a week before the accident the plaintiff was set at work at one of the other stickers, putting through long slats which came out as moldings, with two deep grooves on the bottom, for use in electric light work. He operated this machine successfully nearly or quite a half day, but testifies that he did not set it in motion or stop it. On the day of the accident he was set at work at the machine in question to make a small molding called "quarter round," in the making of which but three heads are used, one of which is the lower head. He testifies that he was given no instructions, but simply told to go ahead. He first oiled the machine wherever he saw oil holes, but was of opinion that he did not oil about the lower head. A man running a neighboring machine started it for him by pulling or pushing the levers, and he began to put the rough material, about an inch square, through the machine in the place indicated by the guides. After working about twenty minutes a strip stopped, and he threw the lever, which operated the feed rolls only, supposing, as he says, that he had stopped the machine entirely. He then went around to the left side of the machine to see what was the matter, and saw that the strip had stopped, apparently against one of the guides. He testifies that it was dark; that he saw no aperture in the table, nor did he see any revolving knives; that he put down his gloved hand to push the strip away from the guide, and his fingers were caught by the revolving knives on the under head and mangled.

The claim is that on this evidence the question whether he was guilty of contributory negligence was properly one for the jury. We cannot think so. As before stated, he was a man of experience in the world, and in possession of all his faculties. He must have known that a machine doing the work which he saw these machines do before his very eyes was and must be a complicated machine, fitted with numerous powerful cutting instruments, which necessarily were moving with great velocity and power. The danger signal was before

Gardner v. Paine Lumber Co. 123 Wis. 338.

him, and could not be mistaken except through the most heedless inattention. He himself says:

"I knew there were some kind of knives in the machine. . . . I knew they couldn't make shavings and quarter rounds unless they had some kind of knives."

But he says he did not know where they were located, and he could see nothing but a black surface where he placed his hand, and that he thought he had stopped the machine. But here again it becomes apparent that these are mere excuses for unpardonable inattention or reckless disregard of consequences. He could not fail to know, if he bestowed the least thought on the question at all, that the machine was still in operation; the belts were necessarily in rapid movement— he admits the large belt of the machine was still moving; the heads, weighing sixty pounds each, were revolving with great velocity, necessarily imparting a constant whir and vibration to the machine; they were all right before him, except that the small belts were underneath the table. If he was so ignorant as he testifies as to the location of the knives, and if the light was so dim that he could not see, ordinary prudence only called the more loudly for careful examination before placing his hand in the very midst of so powerful a machine.

We have been unable to see any escape from the conclusion that the plaintiff must be held guilty of contributory negligence. Such accidents are always very distressing, and the appeal to the sympathies is strong, but legal rules cannot be varied for such reasons. Adjudicated cases are of little substantial help, because there are never two accidents under exactly the same circumstances. Among the cases in this court having some analogy to the present case may be named *Dougherty v. West Superior I. & S. Co.* 88 Wis. 343, 60 N. W. 274; *Schiefelbein v. Badger Paper Co.* 101 Wis. 402, 77 N. W. 742; *Groth v. Thomann,* 110 Wis. 488, 86 N. W. 178; *Koepcke v. Wisconsin B. & I. Co.* 116 Wis. 92, 92 N. W. 558. A verdict for the defendant should have been di-

rected, in default of which the motion of defendant for judgment *non obstante* should have been granted. Not having been granted, this court will direct the proper judgment, instead of ordering a new trial. *Muench v. Heinemann,* 119 Wis. 441, 96 N. W. 800.

*By the Court.*—Judgment reversed, and action remanded with directions to render judgment in favor of defendant.